AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| 134 West 61st Street | ) | Case No.  2:20-MJ-06163 |
| Los Angeles, California 90003 | ) | |
| (SUBJECT PREMISES) | ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252A(a)(2)(A) and (b)(1) | Receipt or distribution of child pornography |
| 18 U.S.C. § 2252A(a)(5)(B) and (b)(2) | Possession of and access with intent to view child pornography |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

**DEREK R. BAKER**
_____
*Applicant's signature*

Derek R. Baker, Special Agent - HSI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  _____

_____
*Judge's signature*

City and state: Los Angeles, CA

Hon. Karen L. Stevenson, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Catharine A. Richmond (x.7162)

## ATTACHMENT A

## PREMISES TO BE SEARCHED

The premises to be searched is the property located on the parcel at 134 West 61st Street, Los Angeles, California 90003 ("SUBJECT PREMISES"). The SUBJECT PREMISES appears to be a tan, single-family dwelling with a brown tile-style roof. The front door appears to face northwest (West 61st Street). The numbers "134" are displayed in silver on the front of the garage. There appears to be a concrete driveway which runs from West 61st Street to the attached-style garage on the north side of the residence. A white metal-style fence appears to separate the dwelling from the pavement onto West 61st Street. The SUBJECT PREMISES is reached by traveling north from the intersection of West Gage Avenue and South Main Street, along South Main Street to West 61st Street. Then, turn west onto West 61st Street and travel approximately 416 feet to the SUBJECT PREMISES, which is located on the south side of West 61st Street. The SUBJECT PREMISES is the seventh residence on the south side of West 61st Street from the intersection with South Main Street. The SUBJECT PREMISES includes any vehicles (including the 2006 Nissan bearing California license plate 8DGP300) parking spaces, garages, storage spaces, and appurtenances that are associated with the SUBJECT PREMISES.

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 2252A(a)(2)(A) and (b)(1) (receipt or distribution of child pornography); and 18 U.S.C. § 2252A(a)(5)(B) and (b)(2) (possession of and access with intent to view child pornography) (the "Subject Offenses"), namely:

a.   Child pornography, as defined in 18 U.S.C. § 2256(8).

b.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

c.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, and also including but not limited to financial records, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography, as defined in 18 U.S.C. § 2256.

d.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer or relate to any production, receipt, shipment, order, request, trade, purchase, or transaction of any kind involving the transmission through interstate commerce by any means, including by computer, of any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

e.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, identifying persons transmitting in interstate commerce, including by computer, any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

f.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

g.    Any and all records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct.  Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of

child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

h.   Any records, documents, programs, applications, or materials identifying possible minor victims depicted in child pornography and/or minor victims of sexual abuse.

i.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to peer-to-peer file sharing software.

j.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to accounts with any Internet Service Provider.

k.   Any records, documents, programs, applications, materials, and files relating to IP address 76.87.82.34.

l.   Records, documents, programs, applications, materials, and files relating to the deletion, uploading, and/or acquisition of victim files to include photographs, videos, e-mails, chat logs, or other files.

m.   Any digital device used to facilitate the above-listed violations and forensic copies thereof.

n.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

o.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were

created, edited, or deleted, such as logs, registry entries,
configuration files, saved usernames and passwords, documents,
browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,
as well as evidence of the presence or absence of security
software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

v.    evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys,
and other access devices that may be necessary to access the
device;

vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

viii.     records of or information about
Internet Protocol addresses used by the device;

ix.   records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,

search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## X.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool

Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

        iv.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

     c.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

     d.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

     e.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

     f.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been

able to fully search a device because the device or files
contained therein is/are encrypted.

        g.    After the completion of the search of the digital
devices, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

        5.    In order to search for data capable of being read or
interpreted by a digital device, law enforcement personnel are
authorized to seize the following items:

        a.    Any digital device capable of being used to
commit, further, or store evidence of the offenses listed above;

        b.    Any equipment used to facilitate the
transmission, creation, display, encoding, or storage of digital
data;

        c.    Any magnetic, electronic, or optical storage
device capable of storing digital data;

        d.    Any documentation, operating logs, or reference
manuals regarding the operation of the digital device or
software used in the digital device;

        e.    Any applications, utility programs, compilers,
interpreters, or other software used to facilitate direct or
indirect communication with the digital device;

        f.    Any physical keys, encryption devices, dongles,
or similar physical items that are necessary to gain access to
the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

6.    During the execution of this search warrant, with respect to NORMA VIZCARRA, OSVALDO OZUNA MURILLO, HEBER A. OZUNA VIZCARRA, and OSVALDO OZUNA VIZCARRA, who are located at the SUBJECT PREMISES during the execution of the search and who are reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of the warrant, law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of the person onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the person with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

x

7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Derek R. Baker, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.     This affidavit is made in support of an application for a warrant to search the premises located at 134 West 61st Street, Los Angeles, California 90003 (the "SUBJECT PREMISES"), as described further in Attachment A.

2.     As described further in Attachment B, the requested warrant seeks authorization to seize evidence, fruits, and instrumentalities, of violations of 18 U.S.C. § 2252A(a)(2)(A) and (b)(1) (receipt or distribution of child pornography); and 18 U.S.C. § 2252A(a)(5)(B) and (b)(2) (possession of and access with intent to view child pornography) (the "SUBJECT OFFENSES"). Attachments A and B are attached hereto and incorporated herein by reference.

3.     The statements contained in this affidavit are based in part on information provided by U.S. federal law enforcement agents; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents, information gathered from the service of administrative subpoenas; the results of physical surveillance conducted by law enforcement agents; independent investigation and analysis by law enforcement agents/analysts and computer forensic professionals; and my experience, training and background as a Special Agent.

1

4.    Since this affidavit is being submitted for the
limited purpose of securing a search warrant, I have not
included every fact known to me concerning this investigation.
I have set forth only the facts that I believe are necessary to
establish probable cause to believe that contraband and
evidence, fruits, and instrumentalities of violations of the
SUBJECT OFFENSES will be located at the SUBJECT PREMISES.

## II.   BACKGROUND OF SPECIAL AGENT DEREK R. BAKER

5.    I am a Special Agent ("SA") with the United States
Department of Homeland Security ("DHS"), Immigration and Customs
Enforcement ("ICE"), Homeland Security Investigations ("HSI"),
and have been so employed since June 2018.  I am currently
assigned to the HSI Los Angeles Child Exploitation Task Force,
where I investigate criminal violations relating to child
exploitation and child pornography, illegal production,
distribution, receipt and possession of child pornography, in
violation of 18 U.S.C. §§ 2252A.  I have received training in
the area of child pornography and child exploitation and have
observed and reviewed various examples of child pornography in
all forms of media, including computer media.

6.    I have assisted in conducting criminal investigations
relating to subjects who use the Internet and two-way
communication devices, such as cellular telephones, to entice or
coerce minors to engage in sexually explicit conduct in
violation of the Subject Offenses.  I have also participated in
the execution of numerous search warrants, many of which

2

involved child exploitation and/or child pornography offenses. I make this affidavit based upon my personal knowledge and experience, my review of pertinent documentation, and discussions with other law enforcement officers.

7.    Through both my training and my experience, I have become familiar with the methods of operation used by people who commit offenses involving the sexual exploitation of children. I have attended training classes concerning computer crimes and the sexual exploitation of children on the Internet.  This training has given me an understanding of how people involved with offenses relating to the sexual exploitation of children use the Internet to further those offenses.  My experience in investigations in this regard has supplemented my understanding of how people involved in offenses related to the sexual exploitation of children use the Internet to further those offenses.

### III.  BACKGROUND REGARDING CHILD EXPLOITATION OFFENSES, COMPUTERS, THE INTERNET, AND DEFINITION OF TERMS

8.    In this affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256.  The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

9.    Based upon my training and experience in the investigation of child pornography, and information related to me by other law enforcement officers involved in the

investigation of child pornography, I know the following
information about the use of computers with child pornography:

a.  <u>Computers and Child Pornography</u>.  Computers and
computer technology have revolutionized the way in which child
pornography is produced, distributed, and utilized.  Child
pornographers can now produce both still and moving images
directly from a common video camera and can convert these images
into computer-readable formats.  The use of digital technology
has enabled child pornographers to electronically receive,
distribute, and possess large numbers of child exploitation
images and videos with other Internet users worldwide.

b.  <u>File Storage</u>.  Computer users can choose their
method of storing files: either on a computer's hard drive, an
external hard drive, a memory card, a USB thumb drive, a smart
phone or other digital media device, etc. (i.e., "locally") or
on virtual servers accessible from any digital device with an
Internet connection (i.e., "cloud storage").  Computer users
frequently transfer files from one location to another, such as
from a phone to a computer or from cloud storage to an external
hard drive.  Computer users also often create "backup," or
duplicate, copies of their files.  In this way, digital child
pornography is extremely mobile and such digital files are
easily reproduced and transported.  For example, with the click
of a button, images and videos containing child pornography can
be put onto external hard drives small enough to fit onto a
keychain.  Just as easily, these files can be copied onto
compact disks and/or stored on mobile digital devices, such as

smart phones and tablets.  Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device.  Therefore, viewing this child pornography would require a computer, smartphone, tablet, or some other digital device that allows the user to access and view files on the Internet.

c.    Internet.  The term "Internet" is defined as the worldwide network of computers -- a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide.  The Internet is not an online service and has no real central hub.  It is a collection of tens of thousands of computer networks, online services, and single user components.  In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

d.    Internet Service Providers.  Individuals and businesses obtain access to the Internet through ISPs.  ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customer's behalf; and may provide other services unique to each particular ISP.  ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with

them.  Those records often include identifying and billing
information, account access information in the form of log
files, e-mail transaction information, posting information,
account application information, and other information both in
computer data and written record format.

      e.   <u>IP Addresses</u>.  An Internet Protocol address ("IP
Address") is a unique numeric address used to connect to the
Internet.  An IPv4 IP Address is a series of four numbers, each
in the range 0-255, separated by periods (e.g., 121.56.97.178).
In simple terms, one computer in a home may connect directly to
the Internet with an IP Address assigned by an ISP.  What is now
more typical is that one home may connect to the Internet using
multiple digital devices simultaneously, including laptops,
tablets, smart phones, smart televisions, and gaming systems, by
way of example.  Because the home subscriber typically only has
one Internet connection and is only assigned one IP Address at a
time by their ISP, multiple devices in a home are connected to
the Internet via a router or hub.  Internet activity from every
device attached to the router or hub is utilizing the same
external IP Address assigned by the ISP.  The router or hub
"routes" Internet traffic so that it reaches the proper device.
Most ISPs control a range of IP Addresses.  The IP Address for a
user may be relatively static, meaning it is assigned to the
same subscriber for long periods of time, or dynamic, meaning
that the IP Address is only assigned for the duration of that
online session.  Most ISPs maintain records of which subscriber
was assigned which IP Address during an online session.

f.   IP Address – IPv6.  Due to the limited number of available IPv4 IP addresses, a new protocol was established using the hexadecimal system to increase the number of unique IP addresses.  An IPv6 consists of eight sets of combination of four numbers 0-9 and/or letters A through F.  An example of an IPv6 IP address is 2001:0db8:0000:0000:0000:ff00:0042:8329.

10.   The following definitions:

a.   "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

b.   "Chat room," as used herein, refers to the ability of individuals to meet in one location on the Internet in order to communicate electronically in real-time to other individuals. Individuals may also have the ability to transmit links to electronic files to other individuals within the chat room.

c.   "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do

7

not necessarily depict minors engaging in sexually explicit
conduct.

      d.   "Child pornography," as defined in 18 U.S.C.
§ 2256(8), is any visual depiction, including any photograph,
film, video, picture, or computer or computer-generated image or
picture, whether made or produced by electronic, mechanical or
other means, of sexually explicit conduct, where: (a) the
production of the visual depiction involved the use of a minor
engaged in sexually explicit conduct; (b) the visual depiction
is a digital image, computer image, or computer-generated image
that is, or is indistinguishable from, that of a minor engaged
in sexually explicit conduct; or (c) the visual depiction has
been created, adapted, or modified to appear that an
identifiable minor is engaged in sexually explicit conduct.

      e.   "Cloud-based storage," as used herein, is a form
of digital data storage in which the digital data is stored on
remote servers hosted by a third party (as opposed to, for
example, on a user's computer or other local storage device) and
is made available to users over a network, typically the
Internet. Users of such a service can share links and associated
passwords to their stored files with other traders of child
pornography in order to grant access to their collections. Such
services allow individuals to easily access these files through
a wide variety of electronic devices such as desktop and laptop

8

computers, mobile phones, and tablets, anywhere and at any time. An individual with the password to a file stored on a cloud-based service does not need to be a user of the service to access the file. Access is typically free and readily available to anyone who has an Internet connection.

f.    "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

g.    "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related

communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

      h.   "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

      i.   "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

j.    "Log files" are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events including remote access, file transfers, logon/logoff times, and system errors. Logs are often named based on the types of information they contain. For example, web logs contain specific information about when a website was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

k.    "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

l.    "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

m.    "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

n.    "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer

11

storage or processing services by means of an electronic communications system.

o.   "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

p.   A "storage medium" or "storage device" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

q.   "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

r.   A "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

## IV.  BACKGROUND OF PEER-TO-PEER NETWORKS ("P2P")

11.  Peer-to-Peer (hereinafter "P2P") are file sharing programs designed for the purposes of sharing and distributing files.  P2P file sharing is a method of communication available to Internet users through the use of software programs or clients.  P2P file sharing programs allow groups of computers using the same file sharing network and protocols to transfer digital files from one computer system or digital device to another while connected to a network, usually on the Internet. There are multiple types of P2P file sharing networks on the Internet.  To connect to a particular P2P file sharing network, a user first chooses to download a P2P client software program for a particular P2P file sharing network, which can be downloaded from the Internet.

12.  A particular P2P file sharing network may have many different P2P client software programs that allow access to that particular P2P file sharing network or multiple P2P file sharing networks.  These P2P client software programs share common protocols for network access and file sharing.  P2P client software allows the user to set up file(s) on a computer to be shared on a P2P file sharing network with other users on the network.  A user can also obtain files by opening the P2P client software on the user's computer and conducting a search for files that are of interest and currently being shared on a P2P file sharing network.  For example, one commonly used P2P client program is Shareaza.  Shareaza is a free publicly available P2P software program that supports multiple P2P file sharing

networks, including Gnutella, BitTorrent, and eDonkey2000 ("eD2K").

13.  Peers can be identified on P2P networks by their Globally Unique Identifier ("GUID") also known as a user's hash. Each client randomly generates a 16-byte alphanumeric value to uniquely identify itself on the P2P network.  This unique alphanumeric value could be compared to a serial number.  A purpose of the GUID is to uniquely identify the user compared to other peers in order to receive credit for sharing files with users on the network.  Generally, the GUID will identify the same peer/user despite IP address changes, although the GUID can be regenerated by the user. Based on my training and experience, I know the probability of a randomly generated GUID matching another GUID is extremely low.

14.  One method for an investigator to search a P2P network for users possessing and/or disseminating child pornography files is to type in search terms, based on their training and experience, that would return file name results indicative of child pornography.  The investigator would then download the file and determine if it indeed contained child pornography.  If so, the investigator can document the hash value[1] of this file,

---

[1] A hash value is a unique numerical value assigned to files.  Hash values are the equivalent of DNA for a file.  There are several types of algorithms that can be applied, such as Message Digest ("MD") and Secure Hash Algorithm 1 ("SHA-1") families of hashing algorithms.  Hash values are a very reliable method of authenticating files.  It can be concluded with a great degree of certainty that two files which share the same hash value, also share identical content. Based on my training and experience, I know that it is more likely two individuals

to be compared with future identical files observed on the
network.  Although transparent to the typical user, when
searches are conducted, additional results are received from the
servers or other clients, which may include a hash value of the
file, the file size, and the IP addresses of clients who
recently reported to the network as having that file in whole or
in part.  This information can be documented by investigators
and compared to those hash values the investigator has obtained
in the past and believes to be child pornography.  This allows
for the detection and investigation of computers involved in
possessing, receiving, and/or distributing files of previously
identified child pornography.  Therefore, without even
downloading the file, the investigator can compare the hash
value and determine with mathematical certainty that a file seen
on the network is an identical copy of a child pornography file
previously identified as child pornography by law enforcement.

15.  Additionally, another investigative method allows
investigators the ability, while adhering to the network
protocols, to search for files they believe to be child
pornography, using known hash values of files previously
identified as child pornography.  During this type of search,
the investigator can query the network servers for client users
who have recently reported to the network servers that they have
a file, in whole or in part, that matches a known hash value of

---

would share the same DNA than for two files to share the same
SHA-1 hash value. Hash values will change if a file is altered
in any way.

a file previously identified as child pornography.  The network servers will respond with matching results, which include the clients' IP address(es).

16.  The ability to identify the approximate location of these IP addresses is provided by IP geographic mapping services, which are publicly available and also used for marketing and fraud detection.  At this point in the investigative process, an association between a known file (based upon on the hash value comparison) and a computer having a specific IP address (likely to be located within a specific region) can be established.

17.  Once a client user is identified as recently having a file believed to be child pornography, in whole or in part, the investigator can then query that client user directly to confirm the client user has that file, in whole or in part, and/or download that file directly from the client user exclusively, otherwise known as a single source download.  Depending upon several factors, including configuration and available resources, it might not be possible to do either.  The process of sharing files on P2P networks involve clients allowing other clients to copy a file or portions of a file.  This sharing process does not remove the file from the computer sharing the file.  This process places a copy of the file on the computer which downloaded it.

18.  During the query and/or downloading process from a remote client, certain information is exchanged between the investigator's client and the remote client they are querying

and/or downloading a file from.  Such as 1) the remote client's
IP address; 2) if the remote client has the file in whole or
only in part; 3) the file name on the remote client's computer;
4) the hash value of the file; 5) the remote client's GUID;
6) the remote client's software and version; 7) and the
investigator's user hash.  This information may remain on the
remote client's computer system for long periods of time.  The
investigator has the ability to log this information.  A search
can later be conducted on a seized computer system(s) for this
information, which may provide further evidence that the
investigator's client communicated with the remote client.

### V. <u>SUMMARY OF PROBABLE CAUSE</u>

19.  On or about November 13, 2020, while undercover, I
used peer-to-peer ("P2P") software to connect with IP address
76.87.82.34 over the Gnutella network to download a video with a
hash value, or unique digital fingerprint, matched to a file
known to depict child sexual abuse material ("CSAM"), also known
as child pornography.  I watched that video and know, based on
my training and experience, that it contained CSAM.

20.  As it relates to the requested warrant, I believe the
digital device(s) which facilitated the distribution of file
containing CSAM are located at the SUBJECT PREMISES because,
among other things, HSI Special Agent Bethany Owens ("Agent
Owens") obtained information from Charter Communications showing
that the aforementioned IP address is registered to the SUBJECT
PREMISES.

## VI.   STATEMENT OF PROBABLE CAUSE

21.  On or about November 13, 2020, I was conducting an undercover online investigation over P2P networks to find offenders sharing child pornography.

**A. A user on the P2P network Gnutella uses the IP address registered to the SUBJECT PREMISES to share child pornography**

22.  On or about the same day, November 13, 2020, using an undercover computer running investigative software, I noticed that a user from IP 76.87.82.34 ("the -34 IP address") and using GUID – or the unique user identifier – 9FD006E9DA4129CEB8592E9B0C463F00 ("the F00 GUID") on the Gnutella network had several suspicious files available for download.

23.  Using a GUID activity report,[2] I saw approximately 65 of the files offered by the F00 GUID on the -34 IP address for download had previously been matched by various law enforcement officers via hash value as depicting CSAM.  The files contained keywords such as "12 yo horny boy" and "11y boy anal," terms which I know through my training and experience to denote depictions of child sexual abuse material, specifically with

---

[2] A GUID activity report provides, in the form of a spreadsheet, the exact IP address(es), port, timestamp (date and time), SHA-1 hash value, and file name of each file captured as contained on the device utilizing the GUID.  All the information contained in the GUID report is publicly available information that a software licensed to law enforcement agencies scrapes, aggregates, and organizes into the report.

18

"yo" and "y" after a set of numbers usually indicating the age of a child depicted.  The GUID activity report also showed files offered for download with those same keywords and others, like "pthc," "preteen," and "pedo[3]," since approximately July 27, 2019, along with every available file's hash values.

24.  Upon review of the GUID activity report for the F00 GUID, I learned the following:

a.  The F00 GUID was captured using IP 76.94.133.126 from December 19, 2020, at 7:57 p.m. GMT[4] through present.

b.  The F00 GUID was captured using the -34 IP address from approximately October 7, 2020 from 6:54 a.m. GMT through December 14, 2020 at 3:25 a.m. GMT.

c.  The F00 GUID was captured using IP 76.87.56.74 from approximately August 29, 2020 from 9:08 p.m. GMT through 10:09 p.m. GMT.

d.  The F00 GUID was captured using IP 104.32.155.148 from July 27, 2019 9:46 a.m. GMT through June 11, 2020 at 9:34 p.m. GMT.

---

[3] Through my training and experience, I also know these terms, "pthc," "preteen," and "pedo," to indicate files which depict child sexual abuse material.  Specifically, "pthc" means "preteen hardcor" and "pedo" means "pedophile" or "pedophilic.'
[4] GMT stands for Greenwich Mean Time.

25.   As previously described above in greater detail, a GUID is a unique identifier generated by P2P software that is assigned to a specific user and a digital device, unless manipulated by a user or other limited exceptions.

26.   Based on my training and experience, I know that ISP companies such as Charter will assign a "dynamic" IP address to their customers.  Companies often assign customers a dynamic IP address without their knowledge because having a dynamic IP address does not affect the customer's service.  Having a dynamic address, however, allows the ISP to continuously moderate IP addresses to achieve the most efficient use of bandwidth and data usage.  Thus, depending on their multiple customers' ever-changing bandwidth and data needs, the ISP will continuously allocate and reallocate IPs to maximize efficiencies

27.   Thus, despite that the IP addresses used by the F00 GUID changed, the fact that the F00 GUID was the same across the four IP addresses indicates that the user and digital device were the same throughout because absent affirmative manipulation by the user, the unique GUID assigned by the P2P software would remain the same even if the ISP's IP addresses were changing because a P2P's GUID is essentially static whereas an ISP's IP addresses for residences are often dynamic.

20

28.   Based on a publicly available website that shows the approximate geographic mapping of IP addresses, the -34 IP address was linked to the area of Los Angeles, California.[5]   The reason this warrant focuses on the -34 IP address is that I downloaded a CSAM file, described further below, from the F00 GUID using the -34 IP address and information from the ISP that owns that IP address, also described further just below, showed that on the date and time the F00 GUID was using that IP address, it was registered to the SUBJECT PREMISES.   Thus, from this information, I know that on November 13, 2020, someone at the SUBJECT PREMISES, using the F00 GUID and the -34 IP address, was sharing CSAM.

29.   On or about November 13, 2020 from approximately 7:02 p.m. PST through 9:41 p.m. PST, I successfully completed a P2P download over the Gnutella Network by directly connecting my undercover digital device to a device using the F00 GUID and -34 IP.   During the download, I also captured the downloaded file's hash value.

30.   The following is a description of the file I downloaded and I reviewed:

a.   "11yr Spanish boy cute 3 5in dick – [boy+man] Pedo in Car.mpeg," which was a video file approximately one

---

[5] The SUBJECT PREMISES is located in the city of Los Angeles, California.

21

minute thirteen seconds in duration which depicts a prepubescent male, possibly Hispanic and approximately 9-11 years old, wearing a blue shirt that is pushed up to his chest with his pants pushed down below his knees exposing his erect penis while an adult hand, possibly a Caucasian male, masturbates the prepubescent male's penis.

31.   On or about December 9, 2020, Agent Owens served a summons to Charter Communications for subscriber information pertaining to the -34 IP address.

32.   On or about December 11, 2020, Charter Communications responded to the summons with the following summary of subscriber information for the -34 IP address:

        a.   Subscriber Name: NORMA VIZCARRA

        b.   Subscriber Address: 134 W 61st ST Los Angeles, CA 90003-1402 (the SUBJECT PREMISES)

        c.   User Name or Features: OZUNAVIZ11@GMAIL.COM

        d.   Phone number: (323) 480-2188[6]

33.   On or about December 13, 2020, at 6:42 p.m. PST, I initiated another P2P download over the Gnutella Network by directly connecting my undercover digital device to a device using the F00 GUID and -34 IP.  On or about December 19, 2020, at 11:59 a.m. PST the download completed using the F00 GUID, but

---

[6] This phone number was later determined to be the same phone number which was listed for N. VIZCARRA from Los Angeles Unified School District records.

with IP address 76.94.133.126.  The file I downloaded was a picture titled, "Boyfuck Magazine – 2006-05 – Preteen Boy.jpg." I have been unable to personally view the file myself, but I took the hash value of the picture and ran it through a software licensed to law enforcement agencies that searches a database for hash values of files known to depict CSAM.  The search results said that file is part of a "known series" of CSAM called both "8Kids" and "Erik."  A "known series" means that the file has been previously identified by law enforcement as depicting a real, identified child under 18 years old.  Thus, although I cannot say for certain because I have not viewed the file myself, based on the file's title and the database's results, I believe this file likely contains CSAM.

34.  On or about December 19, 2020, at 11:59 a.m. PST, I successfully completed a P2P download over the Gnutella Network by directly connecting my undercover digital device to a device using the F00 GUID using IP address 76.94.133.126.  The file I downloaded was titled, "Boys in action – 011-preteen pedo boy.jpg."  Again, I have been unable to personally view the file myself, but I took the hash value of the picture and ran it through the software described above and the search results said that file has been viewed by multiple law enforcement personnel who have identified it as containing CSAM.

a.   Specifically, five members of law enforcement have viewed the file and described it as depicting two boys engaged in anal sex.

b.   The most full description is as follows: "This still image is a high quality still frame from a Russian Boy Video and depicts 2 blonde haired 8-9 year old boys completely nude in a very dilapidated building that appears to have cement walls and water rotted floors and wall posts. One child is bent over the arm of a heavily soiled and rotted couch with his buttocks high in the air, while the second boy stands behind him. The standing boys groin area is pressed against the buttocks of the kneeling boy in a manner indicating anal intercourse."

**B. SUBJECT PREMISES is occupied by several adults, any one of whom could have used the SUBJECT PREMISES' IP address to share child pornography over Gnutella**

**NORMA VIZCARRA**

35.   As stated just above, Norma VIZCARRA ("Grandma") is the subscriber of the IP address used to share child pornography that is registered to the SUBJECT PREMISES.

36.   On or about December 11, 2020, Agent Owens conducted a records search using Thomson-Reuters Consolidated Lead and

Evaluation Reporting ("CLEAR")[7] for Grandma, which indicated her birthdate is November 4, 1967.

37.   On or about December 14, 2020, HSI Criminal Analyst Nancy Bravo ("Analyst Bravo") conducted a search on the social media website "Facebook" for Grandma.  From this search, Analyst Bravo learned:

a.   Grandma is married to Osvaldo OZUNA MURILLO ("Grandpa"), and has three grown children: two sons, Heber A. OZUNA VIZCARRA ("Uncle One") and Osvaldo OZUNA VIZCARRA ("Uncle Two"), one daughter, Ivett Diana Ozuna, and four minor grandchildren.[8]

b.   On Uncle Two's Facebook there was a linked online article[9] from "La Opinion" dated September 11, 2020, which stated Grandma and Grandpa gained custody of their grandchildren because their daughter, Ivett, was deported to Mexico.  This article further indicated that Uncle Two lived with his seven relatives, including his minor nephews and a niece.

---

[7] CLEAR is a for-pay, publicly-available database which aggregates public information – such as utilities and property records – for searching.

[8] The names listed here are what I believe to be each individual's full name based on the information on Facebook in conjunction with information from the DMV, Department of Homeland Security, and the grandchildren's school.

[9] The online article was located at https://laopinion.com/2020/09/11/familia-busca-hogar-lejos-de-un-grupo-sospechoso/

c.   Analyst Bravo was able to determine the names of the minors to be Said MACIAS, Saul MACIAS, Samuel MACIAS, and Brittany MACIAS (collectively the "MACIAS siblings") from posts Grandma made on her own Facebook page congratulating them on the respective grandchildren's birthdays.

38.   On or about December 14, 2020, Analyst Bravo searched CLEAR for Grandma, and found a positive record for her. Grandma's record linked Uncle One as a "relative" and his report showed that his most recent address, dated as of November 13, 2020, was the SUBJECT PREMISES.

39.   Analyst Bravo provided Agent Owens and I with photographs of Grandma and the MACIAS siblings from Facebook. Analyst Bravo provided Agent Owens and I with the DMV photos of Grandpa, Uncle One, Uncle Two.  Grandma's Facebook page also had a family photo posted which contained Grandma, Grandpa, Uncle One, Uncle Two, and all four MACIAS siblings together which was provided to Agent Owens and me.

40.   On or about December 15, 2020, HSI SA Sharon Lee ("Agent Lee") and Agent Owens surveilled the SUBJECT PREMISES from approximately 6:35 a.m. PST to 10:20 a.m. PST.  As Agent Owens was driving by the SUBJECT PREMISES, she observed a female who appeared to match the description of Grandma outside in the driveway.

41.   On or about December 16, 2020, HSI SA Natasha Yasin ("Agent Yasin") and Agent Owens surveilled the SUBJECT PREMISES from approximately 11:57 a.m. – 3:04 p.m. PST.

a.   Agent Owens saw a male who appeared to be an adult Hispanic man walk out of the front vehicle gate of the SUBJECT PREMISES.  After reviewing Facebook and DMV photos, as well as the physical characteristics provided by the DMV, Agent Owens was generally familiar with the appearances of both Uncle One and Uncle Two.  Both have a strong resemblance to the other and have similar heights, weights, hair, and skin color.  The man Agent Owens saw walking out of the driveway of the SUBJECT PREMISES matched the description of both Uncle One and Uncle Two.  Agent Owens saw a grey 2006 Nissan sedan, bearing California license plate 8DGP300, parked behind the gate in the driveway of the SUBJECT PREMISES.  While sitting in front of the SUBJECT PREMISES, Agent Owens conducted a DMV record check of California license plate 8DGP300.  The DMV records showed that car is registered to "NORMA L VIZCARRA ABARCA."

b.   Agent Yasin and Agent Owens saw a female, who appeared to match the description of Grandma, move about in the driveway behind the gate surrounding the SUBJECT PREMISES.

c.   Agent Owens saw a young Hispanic male, who appeared between 15-16 years old, walk out of the SUBJECT PREMISIS' vehicle gate.  Said and Saul MACIAS are 15 years old.  Although Agent Owens was unable to observe this male closely, he appeared to be the same age and have the same hair and skin tones as Said and Saul MACIAS.  This male walked to a car parked

27

on the street in front of the SUBJECT PREMISES.  The male got into the driver's seat and drove away.  Later, this male returned to the SUBJECT PREMISES in the same car with a girl who appeared to be about 15-16 years old.

### O. OZUNA VIZCARRA ("Uncle Two")

37.  On or about November 8, 2020, Uncle Two submitted a renewed request to continue his DACA status to the Department of Homeland Security, United States Citizenship and Immigration Services.  On that renewal form, he listed the SUBJECT PREMISES as his current mailing and physical address.

### MACIAS SIBLINGS

38.  On or about December 15, 2020, Agent Owens contacted Detective Aaron Gray ("Detective Gray") of the Los Angeles School Police Department, asking for further information about the MACIAS siblings.  Detective Gray provided Agent Owens with records that listed Grandma[10] and Grandpa as the MACIAS siblings' guardians/grandparents and Uncle One and Uncle Two as the MACIAS siblings' emergency contacts/uncles.  The school's records also listed (323) 480-2188 as the number for Grandma, which is the same phone number Charter had listed as the phone number registered to the -34 IP address, of which Grandma is the

---

[10] On the records provided by Detective Gray, guardian information lists variations of "Norma VIZCARRA," including "Norma VIZCARRA ABARCA."

subscriber.  From review of the reports, I learned the MACIAS
siblings' ages:

       a.   Said MACIAS – 15 years old;

       b.   Saul MACIAS[11] – 15 years old;

       c.   Samuel MACIAS – 13 years old; and,

       d.   Brittany MACIAS – 11 years old.

   39.  Based on HSI's observations of a woman who matches
Grandma's appearance on more than one occasion over several
hours at the SUBJECT PREMISES, a man who matches the description
of either Uncle One or Uncle Two being at and leaving the
SUBJECT PREMISES, a boy who matches the general age and
skin/hair appearance of Said and Saul MACIAS leaving and
returning to the SUBJECT PREMISES, and the article which said
that Grandma and Grandpa have custody of the MACIAS siblings, I
believe that Grandma, Grandpa, and the MACIAS siblings live at
the SUBJECT PREMISES.  I also believe that Uncle One and Uncle
Two live at the SUBJECT PREMISES based on the information
provided by CLEAR and immigration records.  In addition, because
the -34 IP address used to share CSAM with me over the Gnutella
Network resolves to this address, any one of these adults could
have been the person who used a digital device to connect to the
Gnutella Network and share child pornography.  Thus, I believe

---

[11] Said MACIAS and Saul MACIAS are twins.

there is probable cause that evidence of the SUBJECT OFFENSES
will be found on the digital devices in the SUBJECT PREMISES.

## VII.  TRAINING AND EXPERIENCE ON INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

40.   Based on my training and experience, and the training
and experience of other law enforcement officers with whom I
have had discussions, I have learned that individuals who view
and possess multiple images of child pornography are often
individuals who have a sexual interest in children and in images
of children, and that there are certain characteristics common
to such individuals:

a.   Individuals who have a sexual interest in
children or images of children may receive sexual gratification,
stimulation, and satisfaction from contact with children; or
from fantasies they may have viewing children engaged in sexual
activity or in sexually suggestive poses, such as in person, in
photographs, or in other visual media, or from literature
describing such activity.  These individuals often maintain
possession of these items for long periods of time and keep
their collections in numerous places – in digital devices in
their homes, in their cars, in their workplaces, or on their
persons.

b.   Individuals who have a sexual interest in
children or images of children also may correspond with and/or
meet others to share information and materials (including
through digital distribution via the Internet); conceal such

correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.  These individuals often maintain possession of these items for long periods of time.

41.   Digital child pornography on a digital device is easy to maintain for long periods of time.  Modern digital devices often have extremely large storage capacities.  Furthermore, cheap and readily available storage devices, such as thumb drives, external hard drives, and compact discs make it simple for individuals with a sexual interest in children to download child pornography from the Internet and save it – simply and securely – so it can be accessed or viewed indefinitely.

42.   Furthermore, even if a person deleted any images of child pornography that may have been possessed or distributed, there is still probable cause to believe that there will be evidence of the illegal activities – that is, the possession, receipt, and/or distribution of child pornography – at the SUBJECT PREMISES or on his person.  Based on my training and experience, as well as my conversations with digital forensic experts, I know that remnants of such files can be recovered months or years after they have been deleted from a computer device.  Evidence that child pornography files were downloaded and viewed can also be recovered, even after the files themselves have been deleted, using forensic tools.  Because remnants of the possession, distribution, and viewing of child

pornography is recoverable after long periods of time, searching the SUBJECT PREMISES could lead to evidence of the child exploitation offenses.

###### VIII.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES[12]

43.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    A person who connects to the Internet must use a computer or mobile device, such as a tablet or wireless telephone, to facilitate that access.  Furthermore, in my training and experience, these devices typically travel with a subject or remain in SUBJECT PREMISES.  It is therefore reasonable to believe that computers, tablets, wireless telephones, and other electronic storage media may be present in SUBJECT PREMISES.  Further, because it is possible to store certain mobile devices, such as removable storage media and wireless telephones, in a pocket, it is reasonable to believe that mobile devices may be found on the persons.

---

[12] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

b.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

c.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

d.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

       e.  Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

       f.  Based on my training, experience, and information
from those involved in the forensic examination of digital
devices, I know that it is not always possible to search devices
for data during a search of the premises for a number of
reasons, including the following:

       i.  Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

       ii.  Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

44. The search warrant requests authorization to use the biometric unlock features of the devices seized, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

35

c.   As noted above, I know that most homes with Internet capability use only one IP address.  That IP address, in turn, is often shared by many devices that access the Internet using a wireless modem.  Accordingly, if there are multiple digital devices discovered during a search of the SUBJECT PREMISES, any of those devices could have been used to access the Internet and download the files discussed above.

d.   Thus, if while executing the warrant, law enforcement personnel encounter a digital device within the scope of the warrant that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to N. VIZCARRA, O. OZUNA, H. VIZCARRA, and O. VIZCARRA, who are located at the SUBJECT PREMISES during the execution of the search: (1) depress the person's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

19.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX.  CONCLUSION

45.  For all the reasons described above, there is probable cause to believe that evidence, fruits, and instrumentalities of violations 18 U.S.C. § 2252A(a)(2)(A) and (b)(1) (receipt or distribution of child pornography); and 18 U.S.C. § 2252A(a)(5)(B) and (b)(2) (possession of and access with

36

intent to view child pornography), as described in Attachment B

will be found in a search of the SUBJECT PREMISES.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
December, 2020.


_____
HONORABLE KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE